# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### FLORENCE DIVISION

|  |  |  |
|---|---|---|
| MICHAEL PAUL NELSON | ) | **Civil Action No.** |
| *Plaintiff,* | ) | |
| v. | ) | **4:23-cv-496-RBH-KDW** |
|  | ) | |
| Guilford County, North Carolina | ) | **COMPLAINT** |
| Danny H. Rogers, Guilford NC | ) | |
| Lieutenant W. Grimes, Guilford, NC | ) | **(Civil Rights:  42 USC 1983 et seq** |
| Officer Alfonso Boyce, Asheboro, NC | ) | **ADA: 42 USC § 12131** |
|  | ) | **Rehab. Act 29 U.S.C. § 794)** |
| *Defendants.* | ) | |
|  | ) | **(Jury Trial Demanded)** |

**NOW COMES** Plaintiff, Michael Paul Nelson, by and through his undersigned counsel, and files this Complaint against Defendants and moves the Court for entry of judgment in his favor against Defendants and alleges for his Complaint and Jury Demand as follows:

## Introduction

The Plaintiff, Michael Paul Nelson, who is blind and a qualified person with a disability under the Americans with Disabilities Act (1990) (a.k.a., "ADA"), brings this civil rights action arising from Defendant's actions on 4 February 2020 at the Guilford County Health Department public lobby located at 507 E Green Drive, High Point, NC 27260 and the Guilford County Detention Center, 507 East Green Drive, High point, NC 27260 (located across a courtyard separating the Health Department from the Detention Center). The Defendant members include Guilford County,

34

Sheriff Danny H. Rogers, Lieutenant W. Grimes, and Police Officer Alfonso Boyce. The Defendant members did commit at least one of the following: used excessive force during arrest, ADA violations during arrest and custody, failed to prevent serious injury while in custody and was deliberately indifferent to such injuries, and failed to secure emergency medical care for Plaintiff. Instead, Defendant members pushed Plaintiff, who was in a wheelchair and unconscious, outside the Guilford Count Jail and left the unconscious Plaintiff lying on the ground.

The Defendants are sued for violations of Plaintiff's civil rights protected by at least the United States Constitution and the ADA.

## JURISDICTION AND VENUE

1.    This action arises under the Constitution and laws of the United and is brought pursuant to 42 U.S.C. § 1983; the Americans with Disabilities Act, 42 U.S.C. § 12131; and the Rehabilitation Act, 29 U.S.C. § 794.

2.    The United States District Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), which gives district courts original jurisdiction over civil action arising under the Constitution, laws or treaties of the United States and 28 U.S.C. § 1343, which gives district courts original jurisdiction over actions to secure civil rights protected by the United States government.

3.    Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

4.    Venue is proper under 28 U.S.C. §1391 as Plaintiff does not live in North Carolina and as a reasonable modification for the disabled Plaintiff under the

Rehabilitation Act of 1973 and the ADA, as all causes of action are federal civil rights issues and the venue is less than three hours from the location where the material acts giving rise to this lawsuit occurred in Guilford County, North Carolina.

5.     The Guilford County Defendants were given notice of this claim by letter, dated 8 November 2021, to James D Secor III, Deputy County Attorney, Guilford Sheriff's Office Attorney and, out of an abundance of caution, on 28 February 2022, to the State Attorney General, Joshua H. Stein should the ADA issues require the same.

## **PARTIES**

6.     Plaintiff Michael Paul Nelson was a resident of Guilford County, North Carolina, at the time the events herein occurred and now lives outside the State of North Carolina.

7.     Defendant Guilford County, at all times relevant to this suit, was a body politic and corporate of the State of North Carolina. James Secor is the Deputy County Attorney with an office at: 400 West Washington Street, Greensboro, NC 27401.

8.     Defendant Danny H. Rogers, upon information and belief and at all times relevant to the Complaint, was Sheriff of Guilford County with his office located at 400 W Washington Street Greensboro, NC 27401 and is the responsible party for the Guilford County Detention Center located at 507 East Green Drive, High point, NC 27260, and was acting in his official capacity.

9.     Defendant Lieutenant W. Grimes, upon information and belief and at

34

all times relevant to the Complaint, acted in her individual and official capacity as an intake officer for booking individuals into the Guilford County Detention Center, 507 East Green Drive, High point, NC 27260.

10.    Defendant Officer Alfonso Boyce, upon information and belief and at all relevant times to the Complaint, was a duly sworn company police officer for North State Security Group LLC, who is under contract with Guilford County for providing "POLICE SERVICES" for Guilford County, including the Guilford County Detention Center in High Point, North Carolina, and was acting in his individual and official capacity. Officer Boyce is now believed to work for Randolph County Sheriff's Department located at 727 McDowell Road, Asheboro, NC 27205.

## FACTUAL ALLEGATIONS

### Plaintiff's Background

11.    The Plaintiff, Michael Paul Nelson, is an honorably discharged veteran of the United States military (Army), where he was a member of the special forces known as the "Green Berets."

12.    The Plaintiff has several physical impairments resulting from multiple traumatic brain injuries (TBI) sustained during combat in the service of this country, wherein such impairments include blindness, extreme sensitivity to light, smells, and sound, which can trigger debilitating migraines that can render Plaintiff helpless and unable to move or speak.

13.    The above-described physical impairments qualify Plaintiff as "a person with a disability" under the Americans with Disabilities Act (ADA).

14.     Due to the above-described physical impairments, the United States Department of Veterans Affairs (VA) has determined that Plaintiff is permanently and totally disabled and unemployable.

15.     The VA has issued numerous prosthetic assistive devices, including (but not limited to) a Talking Wrist Watch, a Sunu band, Ambutech Folding Cane with various cane tips, a Reizen Talking Digital Thermometer, an Apple iPhone 11 Pro Max, an Orcam Body-worn camera, Wireless Noise Cancelling Headphones, BuzzClip mobility aid, Milestone 312-Voice Recorder, Apple Wireless Keyboard, AfterShokz Bluetooth Bone Conduction Headphones, Master Lock non-visual combination lock, Wiley X Brock Poly gray lens with gloss black frame. Such VA-issued prosthetic assistive devices help Plaintiff compensate for his physical impairments.

16.     Plaintiff's "Prosthetic Eyes" are defined by his VA-issued prosthetic assistive electronic recording devices and include a smartphone, a bodycam, and associated software (hereafter "Prosthetic Eyes"). Plaintiff's Prosthetic eyes allow him to record his environment (audio and visual notes), communicate with people in this environment, and navigate his environment.

17.     Plaintiff needs his prosthetic eyes to perform everyday activities sighted people take for granted, including taking notes, documenting faces and names of people he encounters, and obtaining real-time feedback of his environment from a remote person watching his live stream video.

18.     While Plaintiff's combat injuries resulted in the above-described

34

disabilities that make it impossible for him to continue to fight for his fellow Americans as a Green Beret, such a desire is still present, and the electronic technology that comprises his prosthetic eyes alleviates many of his disabilities, and like a phoenix rising from its ashes, Plaintiff now continues to fight for himself and his fellow disabled American citizens as a video journalist:

(a)     by focusing on disability access issues when he travels to government facilities, verifying their compliance with the ADA and informing the appropriate individual(s) when he finds deficiencies so that they can rectify such issues; and

(b)     by recording such matters of interest to the public that are sometimes published on an Internet-based news channel.

### House Hunting in Guilford County

19.     Around the end of 2020, Plaintiff was considering purchasing a home in the Guilford County area.

20.     On 18 December 2020, Plaintiff, wearing his prosthetic eyes that were active and recording, attempted to enter the <u>High Point</u> Guilford County Courthouse to inspect the foreclosure lists, get information about what services are offered in the building, and check for compliance with the ADA.

21.     On 18 December 2020, Defendant Officer Boyce was working at the High Point Courthouse entrance security checkpoint and refused Plaintiff entry beyond the security checkpoint, saying there is a 2014 court order forbidding electronic devices such as the devices that comprise Plaintiff's prosthetic eyes.

22. The 2014 Court was signed by Judge Craig, III and Judge Jarrell, Jr. forbidding citizens from bringing phones, cameras or communication devices into the courthouse with exceptions such as "Persons who use their devices to monitor any health-related issues(s)."

23. Plaintiff's Prosthetic Eyes allow him and others (remotely) to monitor his health-related issues.

24. On 18 December 2020, Defendant Officer Boyce and Daugherty acknowledged that Plaintiff's devices (that comprise his prosthetic eyes) were used as assistive devices and were among the group of police and security that denied Plaintiff's entry into the building while wearing his prosthetic eyes.

25. On 18 December 2020, while at the High Point Courthouse entrance, Plaintiff spoke with Christina Faros (Clerks Office) and requested reasonable accommodations pursuant to the ADA to allow Plaintiff to enter the courthouse with his assistive devices, including his Prosthetic Eyes, so that he may inspect public records including a foreclosure list that perhaps described a house he and his family could buy and make a home.

26. Plaintiff's video of the above 18 December 2020 Health Department visit was published on an Internet-Based News Channel.

27. On 21 December 2020, after watching Plaintiff's video, a citizen, "Relator/whistleblower," on Plaintiff's behalf, filed a request for reasonable accommodations under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, to allow Plaintiff to enter the courthouse while wearing his prosthetic eyes.

34

28.     On 2 January 2020, Plaintiff, wearing his prosthetic eyes that were active and recording, tried to enter the <u>Greensboro</u> Guilford County courthouse to inspect the foreclosure lists and speak with the court's ADA Coordinator.

29.     On 2 January 2020, the <u>Greensboro</u> Courthouse security, including North State Police Officer Sergeant Deal and Officer Geldner, denied Plaintiff entry beyond the security checkpoint based on the same judge's order used at the High Point Courthouse because Plaintiff was wearing his prosthetic eyes. Sergeant Deal contended that a judge's order "overrides the ADA . . . a judge is higher than the ADA" and threatened Plaintiff with arrest and demanded the Plaintiff exit the building. Plaintiff was, however, allowed to ask clarifying questions for about ten minutes without being slammed to the ground and arrested.

30.     On 2 January 2020, Plaintiff informed Officer Geldner and Sergeant Deal that medical exemptions are listed in the order and that one applies to Plaintiff. Still, Officer Deal continued to deny Plaintiff access to the building.

31.     On 2 January 2020, Plaintiff requested the courthouse North State security guards at the entrance checkpoint to contact a Greensboro Courthouse ADA Coordinator (there are two) and request a meeting; however, the security guards indicated they did not know such a person.

32.     On **13 January 2020**, Plaintiff entered the <u>High Point</u> Guilford County Health Department ("Health Department") public lobby with his prosthetic eyes active. Lt. Bowen told Plaintiff he could not record in the Health Department public lobby; however, Leslie Barbee, who later claimed to be "over the building," interjected

and assisted Plaintiff by directing him to the appropriate window for services (thereby effectively allowing Plaintiff's accommodation requests) which Plaintiff used and then exited the building without further issue.

## Officer Boyce Expresses his Desire to
## Violently Arrest the Blind Plaintiff

33.    On 31 January 2020, Plaintiff entered the High Point Guilford County Courthouse with his Prosthetic Eyes active and recording video and was stopped by Officer Boyce at the entrance security checkpoint. Officer Boyce refused Plaintiff's entry because Plaintiff was using his Prosthetic Eyes but allowed Plaintiff to wait by the entrance for ADA coordinator Patricia Dixon who never appeared.

34.    On 31 January 2020, Officer Boyce's body cam recorded Officer Boyce talking to himself as Plaintiff waited for Patricia Dixon. When Plaintiff decided to exit the lobby toward the outside of the building, Officer Boyce's body cam recorded the following audio of Officer Boyce talking to himself and expressing his desires regarding Plaintiff:

> Damit, now he's going to leave. No, don't let him leave. Don't leave. Mother-, don't you leave, no, no, no, you can't just stir this shit up and leave. You're going to come back. You are going to fucking go to jail today. That's all I need is one person to be like, "ok you got to go," and I will put his ass in the fucking floor. Today!

35.    On 31 January 2020, moments later, while waiting at the High Point Guilford County Courthouse entrance, Plaintiff's Prosthetic Eyes recorded a man, in plain close, with an active smartphone in his hand (in plain sight), entering the building and walking past security with their blessing.

34

36.     On 31 January 2020, Plaintiff entered the <u>High Point</u> Guilford County Health Department's public lobby while wearing his prosthetic eyes active and recording, passing Defendant Officer Boyce and an unidentified security guard at the entrance. Defendant Daugherty was inside the Health Department, and both Defendant Officer Boyce and Daugherty allowed Plaintiff to enter. Defendant Daugherty assisted Plaintiff in finding the correct people for the services/information needed, thereby effectively acknowledging that Plaintiff is allowed in the Health Department's public lobby with his Prosthetic Eyes active.

**Plaintiff Revisits High Point Guilford County Health Department**

37.     On 4 February 2020, Tuesday, around 4:30 PM, four days after Officer Boyce's expressed his desire to "put his ass [Plaintiff] in the fucking floor," Plaintiff, with his Prosthetic Eyes active and recording, entered the public lobby of the <u>High Point</u> Guilford County Health Department building.

38.     On 4 February 2020, Officer Boyce is waiting outside the Health Department with his body cam recording, and at one point, Officer Boyce says, "Waiting on this Fucking Clown," clearly referring to the Plaintiff.

39.     A sign was posted on the Health Department entrance doors that stated, "No Cameras or Other Recording Devices Allowed Beyond This Point" (hereafter, "No Recording Devices Policy"). There was no checkpoint at the entrance to enforce the No Recording Devices Policy or to inform Plaintiff of the same.

40.     Plaintiff was at the Health Department for multiple reasons, including (a) inquiring about mental health services, (b) conducting an ongoing investigation of

the same under the Qui Tam provision of The False Claims Act (FCA), 31 U.S.C. §§3729 - 3733, acting as a relator/whistleblower; and (c) gathering information on matters of interest to the public as a video journalist for a news channel.

41.    Plaintiff used his prosthetic eyes to record two videos of his visit to the Health Department: Plaintiff's bodycam recorded a first video, and Plaintiff's smartphone recorded a second video. Plaintiff never went beyond the public lobby and associated bathroom area; thus, his recordings only captured footage of people and things in the Health Department's public lobby.

42.    The videos were time synced and combined into one video, and an elapsed timer was added to the videos to generate the "Elapsed Time" (ET) references used in this document.

43.    Plaintiff approached a first unidentified Lady (U-L1) behind a window and started a conversation. (ET 00:03:12) and four seconds later, U-Robeson (Defendant Robeson) said: "you need to leave." ("U-" means unidentified; after being identified, the "U-" goes away) (ET 00:03:18).

44.    Plaintiff responds to U-Robeson, asking a first time: "Who are you?" (ET 00:3:24) and U-Robeson does not answer; thus, Plaintiff continues talking to U-L1 as U-Robeson tells Plaintiff to leave, prompting Plaintiff to ask U-Robeson a second time to identify himself as Plaintiff does not know his identity again. [ET 00:03:35].

45.    U-Robeson refuses to identify himself and tells Plaintiff that U-L1 does not wish to talk to him and asks Plaintiff what he needs (ET 00:03:47), and Plaintiff

responds, "I am trying to figure out the services offered here." (ET 00:03:50).

46.    U-Robeson next accuses Plaintiff of Harassing U-L1. (ET 00:03:58) and U-Robeson then asks Plaintiff if he had business here. (ET 00:04:25) and  Plaintiff responded, "yes," and asked U-Robeson a third time, "Who are you." (ET 00:04:26).

47.    U-Robeson again refuses to identify himself to Plaintiff, stating, "You don't need to know that." (ET 00:04:30).

48.    Plaintiff then asked U-L1 about the mental health services offered by the Health Department, and a second unidentified lady, U-L2, responded, "I won't be able to help you. It's not in this building at all." (ET 00:04:50).

49.    Plaintiff inquired about a few more issues related to mental health services and then inquired if the Health Department offered contraceptives (ET 00:05:14). The U-L2 asked Plaintiff if he wanted a pack of condoms. Plaintiff responded, "sure," and U-L1 gave Plaintiff a bag of condoms. (ET 00:05:41).

50.    U-Robeson then asks Plaintiff if he is recording, and Plaintiff asks U-Robeson a fourth time to identify himself, and U-Robeson ignores such request. (ET 00:05:53).

51.    Plaintiff sits down to put the bag of condoms in his backpack, continues talking to U-Robeson, and asks U-Robeson a fifth time to identify himself. U-Robeson again refuses to identify himself. [ET 00:06:38].

52.    U-Robeson continues to talk to Plaintiff for over a minute concerning Plaintiff's Prosthetic Eyes. Plaintiff asks U-Robeson for a sixth time to identify himself, and U-Robeson again refuses to identify himself. (ET 00:07:41).

53.     U-Robeson next notes that he knows Plaintiff's name because he and others associated with the Health Department had seen what U-Robeson described as Plaintiff's News channel. (ET 00:07:54).

54.     U-Robeson then asks Plaintiff if he is taking a break (as Plaintiff is sitting down) and tells Plaintiff the Health Department closes in 10 minutes (ET 00:08:23) and then tells Plaintiff, "We can't have people just sitting around." (ET 00:08:56).

55.     Plaintiff responds, "I do have official business here," and informs U-Robeson that he is "working on a news story" in addition to the previous business inquiring about mental health services and condoms. (ET 00:09:08).

56.     U-Robeson next walks over to Plaintiff and touches Plaintiff's cell phone, turning it about 90 degrees from its original position. (ET 00:09:31) and Plaintiff asks U-Robeson what he is doing and tells U-Robeson to "Please don't touch my things." (ET 00:09:32).

57.     U-Robeson states he turned the phone so that Plaintiff is not recording him, contending that Plaintiff's recording U-Robeson without his permission is illegal. (ET 00:09:37 to 41) and Plaintiff responds that such is not true but that U-Robeson violated the law when he touched Plaintiff's cell phone without permission, further explaining that the recording devices are his assistive devices and are an extension of himself. (ET 00:09:55).

58.     Plaintiff asks U-Robeson a seventh time to identify himself, and U-Robeson refuses (ET 00:10:16) and contends that Plaintiff's phone was flashing a light

in his eyes (why he touched it), although no such light can be seen in Plaintiff's body cam video. (ET 00:10:02 – 00:10:56).

59.      U-Robeson then insinuates he believes Plaintiff is faking being blind, saying, "Don't you see me," and "You get along pretty good." (ET 00:11:17).

60.      U-Robeson finally tells Plaintiff he works at the Health Department but still refuses to identify himself when Plaintiff asks U-Robeson if he has a name tag. (ET 00:11:50).

61.      U-Robeson tells Plaintiff he is wearing a name tag but refuses to read the name tag to Plaintiff, which is the eighth time U-Robeson has refused to identify himself, telling Plaintiff he does not have a need to know (his name or his function). (ET 00:11:49 – 00:12:04).

62.      U-Robeson again contends that Plaintiff violated the law by harassing U-L1 and by trying to force her to answer questions (ET 00:12:56 – 00:13:24) and walks away from Plaintiff and says, "you got 10 minutes, and you got to leave." (ET 00:13:38).

63.      Around 4:44 pm, based on the video elapsed time counter, U-Robeson told Plaintiff, "you got 10 minutes, and then you got to leave" (Elapsed Time was 13:38, and Plaintiff entered the public lobby at about 4:30 pm, and the Health Department closed at 5:00 pm).

64.      Plaintiff then stands up and endeavors to determine if U-Robeson has a supervisor (ET 00:15:43), speaks out, and says: "You still here" to find out if U-Robeson is still present; the video shows that U-Robeson is still present but refuses

to answer. (ET 00:16:03).

65.     Plaintiff then asked an unidentified lady at a window close to the entrance of the Health Department if she would identify U-Robeson (ET 00:16:10), and she refused to identify U-Robeson. (ET 00:16:36 – 00:16:58). Plaintiff then asks for a supervisor to assist.

66.     At this point, it should be appreciated that Plaintiff has requested at least four different Health Department employees to identify U-Robeson, and none would.

### Officer Boyce Gets Chance to Violently Arrest Plaintiff

67.     A white case is an international symbol of blindness. It should be noted that the Plaintiff was walking around the Health Department wearing dark sunglasses and using a White Cane. Still, everyone treated Plaintiff as if he could see. Leslie Barbee uses her hands when talking to Plaintiff as if Plaintiff could see her hands. Everyone at the arrest had seen Plaintiff before and appeared to assume Plaintiff would know who they were when they walked up to Plaintiff (like a person with no vision problems). Plaintiff had to continually ask people to identify themselves. Such is only an annoyance until the issue becomes knowing the person talking is a police officer by the uniform the police wear.

68.     Around 4:47 pm, Defendant Leslie Barbee appears and asks, "who are you looking for" (ET 00:17:19), and Plaintiff replies he is looking for an administrator or building manager. (ET 00:17:21).

69.     Barbee responds that she is over the building and that she is going to

ask him one time to please stop recording (ET 00:17:23) and contends that Plaintiff is violating the HIPPA rights of people walking in the Health Department public lobby by recording them. (ET 00:17:34 – 00:17.50).

70.    Plaintiff then asked Barbee to tell him the name of the "gentlemen over here" (U-Robeson) (ET 00:17:55), and Barbee responded by saying: "this is our security, and this is our security, and they're all our security." (ET 00:18:04).

71.    At this point, U-Robeson is the only one who has spoken and based on Barbee's comment, the blind Plaintiff can only assume Barbee is referring to U-Robeson and at least one other previously unannounced security guard.

72.    Plaintiff again asks Barbee to identify U-Robeson, and Barbee refuses, saying, "feel free to ask him." (ET 00:18:10).

73.    At this point, Vince Daugherty speaks up, saying, "I need you to stop recording, and you need to turn that off." (ET 00:18:19).

74.    Plaintiff asks Daugherty, "who are you" and Daugherty responds, "Captain Daugherty," Plaintiff then asks, "with what organization," and Daugherty responds, "Guilford County Security . . . you've seen me before." Plaintiff responds, "I haven't seen you." (ET 00:18:19 – 00:18:25).

75.    Plaintiff then informs Daugherty that U-Robeson had assaulted him (when U-Robeson touched his assistive devices) and that he needed to know U-Robeson's name (ET 00:18:39) and Daugherty responds stating that we will "take care of that later" and informs Plaintiff he can file a complaint through Guilford County. (ET 00:18:50).

76.     Plaintiff then asks Daugherty to identify U-Robeson so that Plaintiff can use U-Robeson's name when he files a complaint (ET 00:19:05), and Daugherty refuses, telling Plaintiff, "you can ask the officer; he'll identify himself." (ET 00:19:06).

77.     Plaintiff then asks U-Robeson to identify himself, and he refuses for the ninth time. (ET 00:19:06).

78.     Plaintiff then asked anybody around to identify U-Robeson, and while at least Five Health Department employees were around, no one responded. (ET 00:19:18).

79.     Daugherty then tells Plaintiff to turn off his recording devices but "not your assistive devices" (ET 00:19:28), and Plaintiff then informs Daugherty that his recording devices are his assistive devices. (ET 00:19:35).

80.     Plaintiff then asks for an ADA coordinator, which is not provided, and Daugherty states that he will be arrested if Plaintiff does not leave the building. At the same time, unidentified Officer Alfonso Boyce (North State Police Officer) speaks for the first time and, speaking over Daugherty, says, "you are going to be arrested for Second Degree Trespass." (ET 00:20:03).

81.     Plaintiff then asked what he would be arrested for and would it be 2nd Degree Trespassing (ET 00:20:06), and U-Officer Boyce responded, saying it could be "whatever it is you want it to be." (ET 00:20:23).

82.     Plaintiff then sought clarification to what was said (as both men kept talking over one another) and asked, "for Second Degree trespassing," and then proceeded to state what he believed to be the relevant law and asked if his

understanding of that was correct (ET 00:20:24),  to which U-Officer Boyce then states, "are you going to leave? Yes, or No." (ET 00:20:30).

83.    Plaintiff responds, "Absolutely. Yes, I will absolutely leave." (ET 00:20:31) and further explains that "I just want to verify what you mean by 2nd Degree Trespassing." (ET 00:20:45).

### Excessive Force: Officer Boyce Was Not Going to Miss His Chance to Violently Arrest Plaintiff This Time

84.    U-Officer Boyce then grabs the blind Plaintiff (ET 00:20:54), and Plaintiff instinctively twisted his body toward the unidentified person grabbing Plaintiff's arm in hopes of his bodycam capturing his identity on video while saying, "Stop, Stop, Stop," and asking, "Who are you?" (ET 00:20:57).

85.    While grabbing the Plaintiff, the U-Officer Boyce continues to escalate the situation by grabbing at the Plaintiff's Prosthetic Assistive devices, including Plaintiff's Prosthetic Eyes, while Security Guard Daugherty steps in to help U-Officer Boyce (ET 00: 21:05) by grabbing and pulling Plaintiff's white cane while U-Officer Boyce raps his right leg around in front of Plaintiff's left leg and places the bottom of his foot against the inside of Plaintiff's right ankle forcing him to the ground. (ET 00:21:13).

86.    U-Officer Boyce continues to attempt to put Plaintiff in cuffs while Plaintiff continues to resist an unwanted touch from an unidentified person and asks for U-Officer Boyce's identity. (ET 00:21:07 – 00:21:43).

### Officer Boyce Identifies Himself

87.    U-Officer Boyce violently lifted the blind Plaintiff's torso/head and then slammed the blind Plaintiff to the floor while screaming at the blind Plaintiff to "stop resisting," and, for the first time, U-Officer Boyce finally identified himself as a police officer around 4:52 pm (ET 00:21:43).

88.    U-Officer Boyce was present at the scene of the arrest at least by 4:47 pm (although Plaintiff did not know of his presence) when Barbee approached Plaintiff. U-Officer Boyce spoke for the first time around 4:50 pm (now Plaintiff knows of his presence but does not know who he is). Officer Boyce identified himself to Plaintiff around 4:52 pm *after* grabbing and throwing Plaintiff to the ground.

89.    Plaintiff responds, "Why could you not say that. My goodness," and stops resisting. (ET 00:21:54).

90.    Plaintiff, now with multiple injuries from the violent arrest, stopped resisting at such point, and Officer Boyce handcuffed the blind Plaintiff behind his back, but the now injured Plaintiff could not respond to the now identified Officer Boyce's commands to stand as Plaintiff is injured from the violence Officer Boyce used during the arrest, which included slamming Plaintiff to the ground and cuffing Plaintiff behind his back.

91.    It should be appreciated that a blind person cannot run away and poses a minimal safety risk making handcuffs not only unnecessary but dangerous (fall

34

risk).

92.     Plaintiff is now injured and cannot walk but is mentally alert and the following occurs: (a) Robeson brings a wheelchair over to Officer Boyce, (b) Officer Boyce, Robeson, and Daugherty attempt to put the already injured Plaintiff (still handcuffed) into the wheelchair, (b) Officer Boyce twists Plaintiff's torso upward while Plaintiff's legs are off to the Plaintiff's left with the wheelchair on Plaintiff's left, (c) Officer Boyce, standing behind Plaintiff, loops his arm through Plaintiff's handcuffed arms tries to pick him up and twist his body to place him in the wheelchair sitting parallel to Plaintiff's legs, (d) Officer Boyce tries a few times to shove Plaintiff's body sideways into the wheelchair while lifting Plaintiff by his handcuffed arms, (e) Officer Boyce keeps yanking on Plaintiff while Robeson runs over Plaintiff's legs with the wheelchair, pinning Plaintiff's legs underneath while Officer Boyce continues to try to force Plaintiff's body into the wheelchair, (f) Robeson tilts the chair backward so Officer Boyce can get Plaintiff's feet/ legs out from under the wheelchair, while Plaintiff's hands are cuffed behind him, and with Plaintiff still wearing his backpack, (g) Daugherty steps in to assist and grabs the Plaintiff's ankles while Officer Boyce again lifts the Plaintiff with his handcuffed arms, (h) they try lifting Plaintiff's full body weight by his ankle and elbows, causing his knees to over-extend (ET 00:24:26) and putting a dangerous amount of pressure on his wrists (at the handcuffs) and shoulders while Plaintiff yells out in pain, (j) they drop Plaintiff's neck on the arm of the wheelchair cutting off Plaintiff's airway, (k) Plaintiff yells out, "I cannot breathe," (l) They force him forward to uncuff him so that they can remove his backpack and

his body camera while he cries out in pain and gasps for air, and (m) they cuff him again once the pack is off, and Daugherty leaves to get a larger wheelchair.

### The Detention – Plaintiff Injured During Transport

93.    After being put in a wheelchair and while being moved across a courtyard to the Guilford County Detention Center in High Point (hereafter "Detention Facility"), under the control of Sheriff Danny H. Rogers, the Plaintiff yells for help as he is now unsure who is hurting him.

94.    The Plaintiff was arrested around 4:50 pm. The Plaintiff can be heard mentally alert and yelling for help until around time index **5:02 pm (Plaintiff's Video)**, or about 12 minutes after being arrested when someone says: "<u>watch his head</u>," **and Plaintiff becomes silent, stops moving, and is unresponsive to verbal questions**. (later determined that Plaintiff is unconscious from a bleeding brain caused by a head impact).

95.    Officer Boyce, Robeson, and Daugherty were still present when Plaintiff became silent, with Daugherty carrying some of Plaintiff's property and Robeson pushing the wheelchair.

96.    At 5:00 pm (Detention Facility video), Robeson is seen pushing Plaintiff down a hallway outside the Magistrate's office to a desk at the end of the hallway. Plaintiff's sitting in the wheelchair, leaning to his left with his back to the camera. Plaintiff is not moving and is unresponsive to all that attempt to communicate with him.

97.     Officer Boyce does not request medical care or a medical evaluation of Plaintiff, just leaves Plaintiff in the hallway outside the Magistrate's office.

**From this point, the *Time* tags come from Detention Facility Videos**

**(Elapsed Time After Injury "ETAI" 00:00:00)**

98.     At 5:03 pm (ETAI 00:03:00): Officer Boyce returns from the magistrate's office and appears to talk to Plaintiff, but Plaintiff is unresponsive and has not moved.

99.     At 5:14 pm (ETAI 00:12:00): Upon information and belief, the magistrate, D. E. Gillespie, Jr. (hereafter "Magistrate Gillespie"), with paperwork in hand, puts paperwork on the desktop in front of Plaintiff, looks at Plaintiff and returns to his office.

100.     At 6:01:22 pm (ETAI: 01:01:22): An male Officer with a beard and a female Officer walks past Plaintiff on the way to the magistrate. The male Officer seems concerned about Plaintiff, and both Officers examine Plaintiff for about 30 seconds while they wait for the door to be unlocked. The door unlocks, Officer Boyce comes out, and the Officers enter the magistrate's office. Officer Boyce puts Plaintiff's stuff on Plaintiff's lap and returns to the magistrate's office.

101.     At 6:03:33 pm, Officer Boyce returns to Plaintiff and pushes him back out the door they previously entered. Officer Boyce pushes Plaintiff to "booking." Plaintiff's condition has not changed (unresponsive, not moving, not talking).

102.     From 5:14:00 pm to 6:03:33pm: About ten (10) Officers passed Plaintiff to go to the magistrate's office, and while they all looked at Plaintiff for a moment,

34

none checked on Plaintiff's condition but for the two Officers noted above. None of the Officers did anything (that can be seen in the video) regarding securing medical treatment for Plaintiff.

103.    At 6:03:33 pm (ETAI: 01:3:33):  Just over an hour has lapsed since the Plaintiff suffered a head injury and became unresponsive. Plaintiff is now at booking where Plaintiff is registered as being "received" at "18:06" by Lieutenant W. Grimes.

The video at booking shows a front view of Plaintiff, who is slumped over to his left in a wheelchair, not moving, not talking and unresponsive to all that try to communicate with him.

104.    At 6:07:00 pm (ETAI: 01:07:00): Only Officer Boyce and Plaintiff can be seen in the video. Officer Boyce walks over to Plaintiff and pushes down hard on Plaintiff's sternum with his knuckles (or the tip of a pen); actions consistent with a sternum rub. Plaintiff does not respond. Officer Boyce repeats this procedure three times, and Plaintiff does not respond.

105.    At 6:07:38 pm (ETAI: 01:07:38): After Officer Boyce performs three sternum rubs (about 30 seconds), Plaintiff does not respond.

106.    Upon information and belief, Officer Boyce does not provide or obtain medical services to Plaintiff in response to the sternum rub test results.

107.    At 6:08:12 pm: An older Deputy with white hair and glasses (John Doe 1) enters the booking area and stands behind Plaintiff's wheelchair. Neither Lt.

34

Grimes nor John Doe 1 show any concern about Plaintiff's condition. John Doe 1 pushes Plaintiff out of booking and back to the magistrate's hallway. Lt. Grimes and Officer Boyce follow.

108.    At 6:14:15 pm, Plaintiff is back in the hallway in front of the magistrate's office. Plaintiff has not moved for over one hour and fifteen minutes at this point. Plaintiff is sitting in a wheelchair, unresponsive, not moving and not talking.

109.    At 6:19:08 pm: Magistrate Gillespie comes out of his office and appears to talk to Plaintiff as if asking Plaintiff to sign something. Plaintiff is unresponsive, and Magistrate Gillespie returns to his office at 6:21:03.

110.    At 6:27:00 pm (ETAI: 01:27:00): John Doe 1 pushes Plaintiff out of the hallway and back to booking. Officer Boyce is following. Plaintiff is unresponsive.

111.    At 6:28:02 pm: Plaintiff is pushed through booking to the detention area.

112.    At 6:28:34 pm: **Detention Area Camera**: Plaintiff is in the detention area, and a male Deputy (John Doe 2) (a) starts recording Plaintiff with a handheld video recorder. Plaintiff is unresponsive, not talking and has not moved for about 1.5 hours at this point.

113.    At 6:30:05 pm: Deputy John Doe 3 and Deputy John Doe 4 moved Plaintiff to a different Wheelchair. Plaintiff has not moved or responded in any way. John Doe 3 pushes Plaintiff out of view of the camera toward the "dress out" area.

114.    At 06:31:15 [ETAI: 01:31:15]: **Dress out area Camera**: Plaintiff can be seen sitting in a wheelchair, unresponsive and not moving. Nurse Charles, a Registered Nurse (RN) in a blue jumpsuit, walks up to Plaintiff and appears to

34

examine Plaintiff. Check vitals: Temperature, O2, Pulse, and Blood Pressure with an electronic device first and then checks manually.

115.    At 06:38:52 [ETAI: 01:38:52]: The examination of Plaintiff ends. Plaintiff is unresponsive and has not moved in over one hour and thirty-eight minutes. It has been about 30 minutes since Plaintiff did not respond to a sternum rub.

116.    At 06:40:50: Plaintiff is lying on his back in a "dress out" room. Deputy John Doe 5 and Deputy John Doe 6 changed Plaintiff into an orange jumpsuit and left Plaintiff lying on the floor, unresponsive and not moving. No one has shown any concern on camera regarding Plaintiff's health status.

117.    At around 6:45:00: **John Doe 2 handheld recording**: Plaintiff's clothes are put back on, and John Doe 1 pushes Plaintiff to the exit of the Sally port followed by Lt. Grimes, and other John Does. Plaintiff is not responsive, has not moved for almost two hours, and is not talking.

118.    At around 7:02:00: **John Doe 2 handheld recording**: Magistrate Gillespie meets Plaintiff at the Sally Port exit. Upon information and belief, Magistrate Gillespie tells the unconscious Plaintiff that he has:

> ". . . not signed the "something" to appear; however, such are the conditions of your release. You will be released and moved from the courthouse." (may not be exact wording).

119.    Around 7:02 pm, a little over **two hours after** being knocked unconscious and about **one hour after** not responding to a sternum rub, and according to the CONDITIONS OF RELEASE AND RELEASE ORDER (hereafter "Release Order"), Plaintiff was released without bail/bond stating his release is

34

authorized upon execution of his "WRITTEN PROMISE" to appear.

120.    The Release Order, under a "WRITTEN PROMISE TO APPEAR OR CUSTODY RELEASE" section, has a "Signature of Defendant" block. In such block, are the words: "Refused to Sign." Such indicates the unconscious Plaintiff "Refused to Sign."

121.    Around 7:03:00 [ETAI: 02:03:00]: **John Doe 2 handheld recording**: Upon information and belief, Lt. Grimes and other John Does can be seen pushing Plaintiff out of the "courthouse." John Doe 2 handheld recording stops; however, upon information and belief, Lt. Grimes and other John Does push Plaintiff to an area outside the courthouse, remove him from the wheelchair and leave Plaintiff lying on

the ground/sidewalk unresponsive and not moving or talking.

## AFTERMATH

122.    At about 7:58 pm, about an hour after being left on the ground/sidewalk (about three hours after his head injury), the partially conscious Plaintiff was able to use his VA-issued phone with an easily accessible emergency call feature, to call Guilford County EMS as indicated on the associated "Guilford Metro 911 Communications" event report.

| Guilford Metro 911 Communications | | | |
|---|---|---|---|
| Event Report | | | |
| Event ID: **2020-059756** | Call Ref #: 351 | | Date/Time Received: 02/04/20 19:58:32 |
| Rpt #: 20-008391 | Prime Unit: M221 ▓▓▓▓ | | Services Involved |
| Call Source: W911 | | | LAW    EMS |
| Location: **505 E GREEN DR** | | | DIST: 89.33 ft |

123.   The High Point Medical Center Emergency Department later determined that Plaintiff had suffered a brain injury that caused a bleed in his brain and transferred him to Forsyth Medical Center to a more equipped Neurology department who concurred. (see image below).

| Narrative | Performed At |
|---|---|
| CLINICAL DATA:  Assault trauma. Head pain, neck pain, and low back pain. | ISITEPOW |

EXAM:
CT HEAD WITHOUT CONTRAST

CT CERVICAL SPINE WITHOUT CONTRAST

TECHNIQUE:
Multidetector CT imaging of the head and cervical spine was performed following the standard protocol without intravenous contrast. Multiplanar CT image reconstructions of the cervical spine were also generated.

COMPARISON:  None.

FINDINGS:
CT HEAD FINDINGS

Brain: Small 6 mm hyperattenuating focus in the subcortical white matter of the left posterior frontal lobe suggesting a small intraparenchymal hematoma. There is also vague increased attenuation along the gray-white junction of the left frontal lobe apart from this area suggesting venous shear injury. There is no mass effect or midline shift. No abnormal extra-axial fluid collections. Gray-white matter junctions are distinct. Basal cisterns are not effaced. No ventricular dilatation.

124.   The Plaintiff's level of consciousness would not improve to the point of responding to verbal communications until 5 hours later in a hospital and would finally improve to full consciousness a couple of days later.

125.   The Defendants' conduct violated Plaintiff's rights protected by well-established Constitutional Law, including the Fourth and Fourteenth Amendments to the United States Constitution.

126.   The Defendants violated Plaintiff's civil rights and the ADA in the outrageous manner described herein because Defendant Guilford County has failed to properly train the Defendant Employees or to verify that those working as an agent for Defendant Guilford County (via contractual duties) and had established customs and practices of encouraging and condoning such civil rights violations. To any extent that the Defendants' misconduct was not pursuant to such customs, it was the direct result of Defendant Guilford County and its Sheriff Danny H. Roger's failure to supervise and train its officers regarding the reasonable use of force and the need for timely secure medical care by an appropriated healthcare provider, particularly in the context of interacting with at-risk disabled citizens. The Defendants, Guilford County and Danny H. Rogers, were all well aware of the risks that its Defendant employees and policies presented to the public's safety, particularly the disabled, like Plaintiff, and were deliberately indifferent to the same.

127.   As a direct and proximate result of Defendants' misconduct as described in the above paragraphs, Plaintiff sustained personal and physical injuries and damages including, among others, the following:

(a)     Traumatic Brain Injury, including loss of consciousness from a life-threatening head injury that caused Plaintiff's brain to bleed from being knocked unconscious while handcuffed in custody at or during transport to a detention facility -- from which he has not fully recovered as of the drafting of this document (i.e., permeate disability);

(b)     Emotional distress from later learning that humans at the magistrate's office and detention facility did not seek competent emergency medical treatment for the unresponsive Plaintiff (for over two hours) but instead released him and moved him outside the magistrate's office and left him unconscious on a sidewalk/courtyard;

(c)     Nerve damage to his wrist due to being handcuffed behind his back in a wheelchair and sitting on his wrist in a damaging way while unconscious such that he could not feel the dangerous pressure on his wrists and reposition his weight off his hands.

(d)     Physical pain, mental suffering, severe emotional distress, humiliation, indignities, embarrassment, and loss of reputation;

(e)     Medical Expenses, Life-care expenses; and

(f)     Legal Fees.

## FIRST CAUSE OF ACTION
### VIOLATION OF 42 U.S.C. § 1983
### Violation of Amend. IV to the U.S. Constitution
### Unreasonable Seizure of the Person – No Probable Cause
### (Defendant Officer Boyce)

128.     Plaintiff hereby realleges and incorporates by reference all allegations of fact and law set forth in the previous paragraphs as if repeated in full herein.

129.     Statute 42 U.S.C. §1983 was enacted after the Civil War to create a cause of action for monetary damages and other relief on behalf of individuals who

were deprived of human rights protected by at least the United States Constitution by others acting under color of state authority.

130.     Pursuant to N.C.G.S. §74E, as part of the Company Police Program, the Attorney General is given the authority to certify an agency as a company police agency and to commission an individual as a company police officer.

131.     Pursuant to N.C.G.S. §74E-6(a), an individual who is commissioned as a company police officer must take the oath of office required of a law enforcement officer before the individual assumes the duties of a company police officer.

132.     Pursuant to N.C.G.S. §74E-6(c), Company police officers, while in the performance of their duties of employment, have the same powers as municipal and county police officers to make arrests for both felonies and misdemeanors and . . . shall have [] the authority to carry concealed weapons pursuant to and in conformity with G.S. 14-269(b)(4) and (5).

133.     This claim under 42 U.S.C. § 1983 is brought against Defendant Officer Boyce in his individual capacity as an armed Company Police Officer under contract with a State Agency to enforce the laws of the State of North Carolina on Guilford County property, including the Guilford County Health Department.

134.     Plaintiff has a natural right to be free from unreasonable searches and seizures guaranteed by well-established Constitutional Law comprising at least the Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment to the United States Constitution.

135.     Plaintiff had implied consent to be on the Guilford County Health

Department Property, a non-public forum, as it was open for business; he had a reason for being there, and he committed no acts that would lead a reasonable officer under the circumstances to believe Plaintiff had committed acts that voided his implied consent to be on the property.

136. The seizure and arrest of Plaintiff were unlawful in that Defendant Officer Boyce did not have a warrant or probable cause to believe Plaintiff had engaged in, was engaging in or was about to engage in any criminal conduct, including trespassing, nor did Defendants have any objective facts to form a basis for reasonable suspicion.

137. Defendant Officer Boyce knew or should have known, and a reasonable officer would have known, based on the circumstances confronting them, that their actions associated with seizing and arresting Plaintiff were not objectively reasonable and would violate Plaintiff's well-established natural human right to be free of unreasonable seizures protected by the Fourth Amendment.

138. Defendants Officer Boyce, acting under color of law, deprived Plaintiff of his well-established constitutionally protected human right to be free of unreasonable seizures (including arrests) of the person.

139. As a direct and proximate result of the acts described above, Plaintiff has suffered grievously, enduring: 1) the loss of his liberty and freedom, 2) mental and emotional injury, distress, pain and suffering, 3) attorney's fees and 4) any other special and general damages and expenses, in an amount to be proven at trial.

WHEREFORE, Plaintiff seeks judgment against Defendant Officer Boyce in

the amount of at least two hundred and fifty thousand ($250,000) Dollars in compensatory and punitive damages, plus attorney fees and costs.

## SECOND CAUSE OF ACTION
### VIOLATION OF 42 U.S.C. § 1983
### Violation of Amend. IV to the U.S. Constitution
### (Unreasonable Seizure – Excessive Force)
### (Defendant Officer Boyce)

140.    Plaintiff hereby realleges and incorporates by reference all allegations of fact and law set forth in the previous paragraphs as if repeated in full herein.

141.    Even assuming arguendo the arrest was supported by probable cause, Defendant knew or should have known that a reasonable officer on the scene at the time of the alleged acts would understand that Defendant's actions were NOT objectively reasonable and, thus, violated Plaintiff's human rights protected by well established Constitutional Law comprising at least the Fourth Amendment to the United States Constitution for at least the reason the force used to seize and detain the blind Plaintiff was excessive, unnecessary, gratuitous, and disproportionate considering at least:

(a)     the arresting Officer Boyce's previously stated desire to "put him [Plaintiff] in the fucking floor;"

(b)     the blind Plaintiff was known by everyone present at the arrest, and they had never seen Plaintiff commit violence;

(c)     the blind Plaintiff was not being violent;

(d)     the blind Plaintiff was unarmed and carried only a camera;

(e)     the blind Plaintiff did not represent a flight risk;

(f)     the lack of urgency, making split-second judgments unnecessary;

34

(g)    the absence of any criminal activity; and

(h)    Plaintiff's use of his Prosthetic eyes to record video was the only reason the Defendants wished to trespass Plaintiff; the use of his Prosthetic Eyes in the Health Department public lobby was allowed as a reasonable accommodation request under the ADA just days before.

142.    Company Police Officer Boyce acting under the color of law, used objectively unreasonable and excessive force in his detention and arrest of Plaintiff.

143.    As a direct and proximate result of the acts described above, Plaintiff has suffered grievously, enduring: 1) the loss of his liberty and freedom, 2) mental and emotional injury, distress, pain and suffering, 3) nerve damage to his wrists, 4) attorney's fees and 5) any other special and general damages and expenses, in an amount to be proven at trial.

144.    The acts of Company Police Officer Boyce violated the Plaintiff's right to be free from an unreasonable seizure and excessive force in violation of well-established Constitutional Law comprising at least the Fourth Amendment to the United States Constitution, enforceable through 42 U.S.C. § 1983.

WHEREFORE, Plaintiff seeks judgment against Officer Boyce in the amount of at least $250,000 ($250,000) Dollars compensatory and punitive damages, plus attorney fees and costs.

**THIRD CAUSE OF ACTION**

**VIOLATION OF 42 U.S.C. § 1983**
**Violation of Amend. XIV to the U.S. Constitution**
**(Deliberate Indifference to Serious Medical Needs)**
**(Defendant Officer Boyce)**

145.    Plaintiff hereby realleges and incorporates by reference all allegations

34

of fact and law set forth in the previous paragraphs as if repeated in full herein.

146.     Plaintiff was knocked unconscious around 5:00 pm. From about 5:00 pm until around 6:00 pm, Officer Boyce left Plaintiff sitting in a wheelchair in the hallway outside the magistrate's office, not moving, not speaking and unresponsive to questions. During such time no medical care was provided to Plaintiff.

147.     Around 6:07:00 pm (ETAI: 01:07:00): Officer Boyce gave Plaintiff several sternum rubs for at least 30 seconds (total) in duration. Plaintiff did not respond to the sternum rubs.

148.     A sternum rub is the application of painful stimulus with the knuckles of a closed fist to the center chest of a patient who is not alert and does not respond to verbal stimuli. If the patient does not respond, it is assumed the brain either did not receive the impulse or could not interpret the stimulus. If the brain is unable to interpret the painful stimulus and send out a correct response, one would think that its integrity is compromised and the patient is at grave risk of losing vital functions. Thus, a patient who does not respond would be thought to be critically ill or injured.

149.     Even non-healthcare professionals know well that moderate to severe traumatic brain injury can result in prolonged or permanent changes in a person's consciousness, awareness, or responsiveness. The standard of care/advice is to "dial 911 immediately to request an ambulance if you're with someone who is unconsciousness, even for a brief period of time, after sustaining a head injury."

150.     Officer Boyce not only did not prevent injury to Plaintiff while Plaintiff was handcuffed and in Officer Boyce's custody, but he also did not seek medical care

for Plaintiff in response to the sternum rub test results. It should be appreciated that Officer Boyce also knew that Plaintiff had not been responsive to questions or moved for over an hour after a head impact during transport. Upon information and belief, Officer Boyce released the Plaintiff to the custody of Lieutenant W. Grimes, who booked the unresponsive Plaintiff into the Guilford County Detention center.

151.    Defendant Officer Boyce's acts or omissions were deliberately indifferent to Plaintiff's serious medical needs, thereby depriving him of due process under the Fourteenth Amendment and constituted an unreasonable seizure under the Fourth Amendment, enforceable through 42 U.S.C. § 1983.

152.    As a direct and proximate result of the acts described above, Plaintiff has suffered grievously, enduring: 1) memory loss, 2) mental and emotional injury, distress, pain and suffering, 3) medical expenses and any other special and general damages and expenses, in an amount to be proven at trial.

WHEREFORE, Plaintiff seeks judgment against Company Police Officer Boyce in the amount of at least Three Million ($3,000,000) Dollars in compensatory and punitive damages, plus attorney fees and costs.

### FOURTH CAUSE OF ACTION
### VIOLATION OF 42 U.S.C. § 1983
### Violation of Amend. XIV to the U.S. Constitution
### (Deliberate Indifference to Serious Medical Needs)
### (Failure to Secure Medical Services)
### (Defendants Lt. W. Grimes; Sheriff Danny Rogers)

153.    Plaintiff hereby realleges and incorporates by reference all allegations of fact and law set forth in the previous paragraphs as if repeated in full herein.

154.    Plaintiff was knocked unconscious around 5:00 pm. From about 5:00 pm until around 6:00 pm, Plaintiff sat in a wheelchair in the hallway outside the magistrate's office, in plain sight, not moving, not speaking and unresponsive to questions.

155.    Upon information and belief, Officer Boyce had told at least the other Defendants that Plaintiff was faking being unconscious for a YouTube video. However, at about 7:58 pm, about an hour after being left on the ground/sidewalk by at least some of the Defendants (about three hours after his head injury), the partially conscious Plaintiff was able to use his VA-issued phone with an easily accessible emergency call feature, to call Guilford County EMS.

156.    It is a fact that the High Point Medical Center Emergency Department determined that Plaintiff had suffered a head injury that caused his brain to bleed.

157.    During such time, Magistrate Gillespie, as many as 10 (ten) John Doe Police Officers, Officer Boyce, Security Officer Robeson, and Security Officer Daugherty, noted the unresponsive Plaintiff but took no visible action to secure medical care for Plaintiff.

158.    Around 6:00 pm, John Doe 1 pushed the unresponsive Plaintiff to Booking, followed by Lieutenant W. Grimes and Officer Boyce.

159.    Around 6:08 pm, upon information and belief, perhaps based on Officer Boyce's opinion Plaintiff was faking, Lieutenant W. Grimes decided to gamble with Plaintiff's life and "booked" the unresponsive Plaintiff into the Guilford County Detention Center without securing medical care for the unresponsive Plaintiff.

160.    North Carolina makes it a class 1 misdemeanor for custodial personnel of local confinement facilities to fail to provide emergency medical care in a medical emergency. N.C.G.S. §153A-224:

> (b) In a medical emergency, the **custodial personnel shall secure emergency medical care from a <u>licensed physician</u> according to the <u>unit's plan for medical care.</u>** If a physician designated in the plan is not available, the personnel shall secure medical services from any licensed physician who is available. The unit operating the facility shall pay the cost of emergency medical services unless the inmate has third-party insurance, in which case the third-party insurer shall be the initial payor and the medical provider shall bill the third-party insurer. The county shall only be liable for costs not reimbursed by the third-party insurer, in which event the county may recover from the inmate the cost of the non-reimbursed medical services.

161.    Upon information and belief, to comply with N.C.G.S. §153A-224, the Guilford County Detention Center has a Medical Care Plan requiring the intake jailer to make a health assessment of people being booked into the Detention Center and requires the intake jailer to secure a ***<u>licensed physician</u>*** to treat pretrial detainees exhibiting symptoms of possible medical emergencies.

162.    Around 06:31:15, about 1 hour and 30 minutes after Plaintiff suffered his head injury, Plaintiff can be seen sitting in a wheelchair, unresponsive and not moving. Nurse Charles, a Registered Nurse (RN) in a blue jumpsuit, walks up to Plaintiff and examines Plaintiff by checking his vitals: Temperature, O2, Pulse, and Blood Pressure with an electronic device first and then checking manually.

163.    It is well known that if a head injury causes loss of consciousness, even briefly, immediate evaluation by a doctor is necessary. If doctors observe symptoms

or findings that indicate possible brain injury, computed tomography (CT) or sometimes magnetic resonance imaging (MRI) is done. In contrast, Nurse Charles's decision to check Plaintiff's vital signs instead of securing immediate emergency medical care was negligent and did not meet the standard of care for the area or, upon information and belief, the Detention Center's Medical Care Plan.

164.     Upon information and belief, any reasonable healthcare provider would have requested emergency medical care for Plaintiff under the circumstances.

165.     Upon information and belief, instead of securing emergency care for Plaintiff, Nurse Charge decided to gamble with Plaintiff's life and make a guess that Plaintiff was faking being unconscious and submitted the same to the jailers.

166.     Regardless upon information and belief, the Guilford County Detention Center requires the intake jailer to secure a <u>licensed physician</u> for compliance with N.C.G.S. §153A-224 to treat pretrial detainees for medical emergencies.

167.     Upon information and belief, Sheriff Danny H. Rogers has established or allowed an unwritten policy or custom of gambling with the lives of pretrial detainees by allowing a Registered Nurse (RN) to examine pretrial detainees exhibiting medical emergencies instead of securing a licensed physician.

168.     Defendant Lieutenant Grimes', Nurse Charles', and Sheriff Danny H. Rogers' acts or omissions were deliberately indifferent to Plaintiff's serious medical needs, thereby depriving him of due process under the Fourteenth Amendment or constituted an unreasonable seizure under the Fourth Amendment, enforceable through 42 U.S.C. § 1983.

169.   As a direct and proximate result of the acts described above, Plaintiff has suffered grievously, enduring: 1) memory loss, 2) mental and emotional injury, distress, pain and suffering, 3) nerve damage to his wrists, 4) medical expenses and any other special and general damages and expenses, in an amount to be proven at trial.

WHEREFORE, Plaintiff seeks judgment against Defendants Lt. W. Grimes, and Sheriff Danny Rogers in the amount of at least three Million ($3,000,000) Dollars in compensatory and punitive damages, plus attorney fees and costs.

<u>**FIFTH CAUSE OF ACTION**</u>
**42 U.S.C. § 12101-12213 – Violations of**
**Title II of the Americans With Disabilities Act**
**(Officer Boyce and Guilford County)**

170.   Plaintiff hereby realleges and incorporates by reference all allegations of fact and law set forth in the previous paragraphs as if repeated in full herein.

171.   Title II of the ADA prohibits public entities from discrimination on the basis of a disability. 42 U.S.C. § 121311(1)(B)). Title II of the ADA requires reasonable accommodation during an arrest for people with disabilities. Specifically, it requires "reasonable modifications in policies, practices or procedures." 28 C.F.R. § 35.130(b)(7).

172.   Plaintiff is a qualified individual with a disability under the ADA. He is blind and suffers from PTSD as a result of his combat injuries in the US military.

173.   Plaintiff further suffers from the inability to create new long-term memories and extreme sensitivity to light that can cause debilitating headaches

making it extraordinarily challenging to communicate with others.

174.    Due to Plaintiff's blindness, he is not a flight risk to those with untrammeled vision or even less-than-perfect vision.

175.    Due to Plaintiff's multiple TBIs that caused Plaintiff's blindness, he is very susceptible to even mild impacts to the head, making handcuffing Plaintiff behind his back unreasonably risky regarding falls and associated head trauma.

176.    Title II of the ADA applies to the arrest context. <u>Waller v. Danville,</u> VA., 556 F.3d 171, 174 (4th Cir. 2009); <u>Gohier v. Enright</u>, 186 F.3d 1216, 1220-21 (10th Cir. 1999).

177.    Officer Boyce and Guilford County chose to treat the common, foreseeable and lawful consequences of Plaintiff's disabilities (not being able to see that Officer Boyce was a police officer) as illegal activity (resisting arrest).

178.    Such was discrimination in violation of Title II of the ADA. See Gohier, 186 F.3d at 1220. <u>Waller v. Danville,</u> VA., 556 F.3d 171, 174 (4th Cir. 2009); <u>Gohier v. Enright</u>, 186 F.3d 1216, 1220-21 (10th Cir. 1999).

179.    Plaintiff, by virtue of his blindness, could not determine who was speaking to him or any authority such a person might have via such a person's uniform.

180.    Defendant Officer Boyce and Guilford Count also violated Plaintiff's rights under the ADA because they failed to reasonably accommodate his disability in the course of investigation and arrest, causing Plaintiff to suffer more significant injury, trauma, and indignity in that process than other arrestees.

181.    Defendant Officer Boyce and Guilford County failed to provide modifications or reasonable accommodations to Plaintiff in light of his disabilities, and Guilford County failed to adopt policies and procedures or adequately train its police officers to safely interact with the blind or visually impaired.

182.    Some reasonable accommodations for a blind person include not handcuffing the blind behind their back or at all, using less confrontational tactics, allowing the passage of time to defuse the situation, or waiting for backup. Officer Boyce did none of these things because he was not trained to do them and because it was the custom and practice of Guilford County never to do them for the blind.

183.    Unlawful discrimination, pursuant to DOJ regulation, includes a failure to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. 35.130(b)(7).

184.    Officer Boyce could clearly see that Plaintiff's alleged petty trespassing offense was a nonemergency, and Plaintiff even agreed to leave. There was neither exigency to violently arrest Plaintiff nor did he represent a direct threat to anyone within a hundred miles.

185.    Through Defendant Officer Boyce, Guilford County denied Plaintiff reasonable accommodations.

186.    Because Officer Boyce denied Plaintiff reasonable accommodations, Officer Boyce and Guilford County caused Plaintiff to suffer greater injury and indignity in those processes than other arrestees.

34

187.    Officer Boyce and Guilford County knew that accommodations were necessary under Guilford County written policies but were indifferent to the obvious risk of not providing the accommodations.

188.    Guilford County denied Plaintiff the benefit of properly trained officers who would be trained to appropriately interact with the blind and reasonably accommodate such individuals.

189.    Guilford County was on notice of the need for more or different training but was deliberately indifferent to that need.

190.    Further, once Officer Boyce had allowed the handcuffed and helpless Plaintiff to suffer head trauma, making him lose consciousness, the Defendants again failed to provide any reasonable accommodation for such injury, leaving Plaintiff handcuffed behind his back and sitting on his hands for hours causing nerve damage to his wrists that have yet to heal, in violation of not just the Constitution, but again the ADA.

191.    As a proximate result of Defendant Officer Boyce and Guilford County actions and inactions, Plaintiff was injured and physically suffered such that his long-term memory loss has gotten noticeably worse, and he often drops his white case due to nerve damage to his wrists.

WHEREFORE, Plaintiff seeks judgment against Police Officer Boyce and Guilford County in the amount of at least three Million ($3,000,000) Dollars compensatory and punitive damages, plus attorney fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against the Defendants and grant:

a.      Declaratory and injunctive relief, as appropriate;

b.      Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, loss of liberty, privacy, sense of security and individual dignity, and other pain and suffering on all claims allowed by law in an amount noted or to be determined at trial;

c.      All economic losses and damages on all claims allowed by law to be established at trial;

d.      Punitive damages on all claims allowed by law and in an amount to be determined at trial;

e.      Issuance of an Order mandating appropriate equitable relief, including, but not limited to:

    i.      The imposition of policy changes designed to avoid future similar misconduct by Defendants;

    ii.     Mandatory training designed to prevent future similar misconduct by Defendants;

f.      Attorney's fees and the costs on all claims allowed by law;

g.      Pre- and post-judgment interest at the lawful rate; and

h.      Any further relief that this Court deems just and proper, and any other relief as allowed by law.

34

## REQUEST FOR TRIAL BY JURY

Plaintiff requests a trial to a jury on all issues so triable.

Respectfully submitted this 3rd day of February 2023.

s/ William Simmons
_____
William Simmons
SC BAR: 15882
Federal: 10814
**Counsel for Plaintiff**
P.O. Box 1560
Lenoir, NC 28645
Phone: (864) 430 − 9371
william@simmonspatents.com

34